## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ERNEST MORALES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3401 |
| | § | |
| | § | |
| ACADIA ELASTOMERS CORP., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Plaintiff, Ernest Morales, was an employee of Skillmaster Staffing Services, Inc., a temporary staffing company.  Skillmaster Staffing assigned Morales to work at Acadia Elastomers Corporation's plant in Deer Park, Texas.  Morales lost his arm while working as a machine operator at the Acadia plant.  Morales sued Acadia for negligence in state court and Acadia timely removed on the basis of diversity jurisdiction.  Acadia had a workers' compensation insurance policy in effect when the accident happened.  Acadia has moved for summary judgment, asserting that Morales was a borrowed servant, which would bar his negligence claims.  Morales has responded to the motion.

Based on the pleadings, the motion and response, the parties' submissions, and the applicable law, this court grants Acadia's motion for summary judgment and, by separate order, grants final judgment.  The reasons are set out below.

## I.      Background

Ernest Morales was hired by Skillmaster Staffing Services, Inc., a temporary staffing agency, in October 2003.  (Docket Entry No. 10, Ex. 1 at 38–42).  Skillmaster assigned Morales to a job at Acadia's JM Clipper plant in Deer Park, Texas.  (*Id.* at 42).  Acadia assigned Morales to work as a machine operator in Acadia's TDI shop, making gaskets. (Docket Entry No. 10, Ex. 3 at 7).  On November 19, 2003, Morales was operating a gasket press when his left arm was caught in the machine and crushed.  The injury resulted in the amputation of his arm below the elbow.  (Docket Entry No. 1 at 2).  Morales sued Acadia, asserting Texas causes of action for negligence, gross negligence, and malice; Morales alleges that Acadia failed properly to maintain the gasket press; failed to add safety features to its machines to prevent serious injury; and failed to provide reasonably safe working conditions.  (*Id.* at 3).  Morales also alleges that Acadia knew or should have known that a malfunctioning gasket press would pose a severe threat to machine operators but consciously failed to take steps to remedy any malfunction; that Acadia consciously failed to protect workers from the malfunction; and that Acadia consciously failed to add safety features or modifications to prevent severe injury.  (*Id.* at 4).

It is undisputed that Acadia subscribed to workers' compensation insurance at the time of Morales's accident.  (Docket Entry No. 9, Ex. 2; Ex.2-A).  Acadia argues that Morales was its borrowed servant and covered by its workers' compensation policy, barring Morales's negligence claims under the exclusive-remedy provisions of section 408.001 of the Texas Labor Code.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,  477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.   The Dual Employment and Borrowed Servant Doctrines

The Texas Workers' Compensation Act defines "employer" as follows:

"Employer" means, unless otherwise specified, a person who makes a contract of hire, employs one or more employees, and has workers' compensation insurance coverage.  The term includes a governmental entity that self-insures, either individually or collectively.

Tex. Lab. Code Ann. § 401.011.  Section 408.001 of the Texas Workers' Compensation Act

bars an injured employer who is covered by workers' compensation insurance from filing

a negligence action except under circumstances not present here.  *Id.* § 408.001.[1]

Texas courts have recognized the rule that an employee of one employer may become

the borrowed servant of another.  *Wingfoot Enterps. v. Alvardo*, 111 S.W.3d 134, 146 (Tex.

2003); *Sparger v. Worley Hosp. Inc.*, 547 S.W.2d 582, 583 (Tex. 1977).  A person in the

general employment of one employer may become the borrowed servant of a second

employer who controls the manner and details of the employee's work.  *St. Joseph Hosp. v.*

*Wolff*, 94 S.W.3d 513, 537 (Tex. 2003) (plurality opinion); *Producers Chem. Co. v. McKay*,

---

[1]Section 408.001 provides:

(a) Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.

(b) This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence.

(c) In this section, "gross negligence" has the meaning assigned by Section 41.001, Civil Practice and Remedies Code.

(d) A determination under Section 406.032, 409.002, or 409.004 that a work-related injury is noncompensable does not adversely affect the exclusive remedy provisions under Subsection (a).

Tex. Lab. Code Ann. § 408.001.

366 S.W.2d 220, 225 (Tex. 1963).  The test to determine whether a worker is a borrowed servant rather than an independent contractor is whether the employer has the right to control the "progress, details, and methods of operations of the employee's work."  *Thompson v. Travelers Indem. Co. of Rhode Island*, 789 S.W.2d 277, 278 (Tex. 1990).

The right of control may be determined by contract between the general employer and special employer.  *Producers Chem.*, 366 S.W.2d at 226.  When no contract addresses the right to control the employee's manner and detail of work, a court must examine the facts and circumstances disclosed in the record to make the determination.  *Id.*  For Morales to be Acadia's borrowed employee, Acadia must control "not merely the end sought to be accomplished, but also the means and details of its accomplishment as well."  *Thompson*, 789 S.W.2d at 278 (citations omitted).  Whether Morales was Acadia's borrowed servant for the purposes of the Texas Workers' Compensation Act depends on whether Acadia had "the right to direct and control the employee with respect to the details of the particular work at issue."  *St. Joseph*, 94 S.W.3d at 537; *Marshall v. Toys-R-Us Nytex, Inc.*, 825 S.W.2d 193, 196 (Tex. App.–Houston [14th Dist.] 1992, writ denied); *see also Sparger*, 547 S.W.2d 582 (noting that under the borrowed servant doctrine, the essential inquiry is whether a party had the right to control another in the details "of the specific act raising the issue of liability."); *Hilgenberg v. Elam*, 198 S.W.2d 94, 96 (Tex. 1946) (holding that an employee may become another's borrowed servant as to some acts but not as to others).  Examples of the type of control normally exercised by an "employer" include "when and where to begin and stop work, the regularity of hours, the amount of time spent on particular aspects of the work, the

6

tools and appliances used to perform the work, and the physical method or manner of accomplishing the end result." *Thompson*, 789 S.W.2d at 279 (citations omitted); *see also Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969) (listing nine factors to consider in determining whether an entity acted as a worker's "employer," including: who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation; whose work is being performed; whether there was an agreement, understanding, or meeting of the minds between the original and the borrowing employer as to control; whether the employee acquiesced in the new work situation; whether the original employer terminated his relationship with the employee; who furnished tools and the place for performance; whether the new employment was for a considerable length of time; who had the right to discharge the employee; and who had the obligation to pay the employee); *Stephens v. Witco Corp.*, 198 F.3d 539, 542 (5th Cir. 1999) (analyzing the nine *Ruiz* factors).

A worker may have more than one "employer" for the purposes of the Workers' Compensation Act.  In *Wingfoot Enterps. v. Alvardo*, 111 S.W.3d 134, which, like the present case, involved a worker assigned by a temporary staffing agency to work at a factory owned by one of the agency's clients, the Texas Supreme Court held that "the Act's decided bias in favor of employers electing to provide coverage for their employees supports [the] conclusion that the Act permits more than one employer for workers' compensation purposes." *Id.* at 140.  The court explained that an employee of a temporary staffing agency, assigned to a client's workplace, and working under the client's direction, may be a dual employee of both the agency and the client:

> An employee injured while working under the direct supervision of a client company is conducting the business of both the general employer and that employer's client.   The employee should be able to pursue workers' compensation benefits from either.   If either has elected not to provide coverage, but still qualifies as an "employer" under the Act, then that employer should be subject to common law liability without the benefit of the defenses enumerated in section 406.033.

*Id.* at 143.  In *Wingfoot*, a jury had concluded that the staffing agency's client had controlled the details of the employee's work when she was injured.  The Supreme Court held that the staffing agency was also an "employer" protected by the exclusive-remedy provision of Section 408.001.  *Id.* at 134–36.  In *Garza v. Excel Logistics, Inc.*, 161 S.W.3d 473 (Tex. 2005), the Texas Supreme Court examined a related situation.  The employee in that case conceded that the temporary employment agency was his employer when he was injured, but disputed that the agency's client—which had workers' compensation insurance—was also his employer.  *Id.* at 476.  The court held that both could be the employee's employers and that traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury, would determine whether an employee of a temporary employment agency was also an employee of a client company for the purpose of the Workers' Compensation Act.  161 S.W.3d at 477.

These holdings must be applied to the summary judgment record in this case.

## III.   The Summary Judgment Evidence

Neither Morales nor Acadia have submitted a contract between Acadia and Skillmaster Staffing that addresses the extent to which Acadia will control Morales's work or that disavows an intent to create a borrowed-servant relationship with Morales.  This court

8

must examine the facts and circumstances of Morales's work when he was injured to determine whether he was Acadia's borrowed servant.

It is undisputed that Skillmaster hired Morales and assigned him to work at Acadia. Skillmaster issued Morales his paychecks, but had them delivered to Acadia. It is undisputed that Acadia owned the machines and equipment Morales used to perform his work, including the safety equipment Morales used. (Docket Entry No. 10, Ex. 1 at 52). Morales's deposition testimony shows that Acadia also determined the hours that he worked:

Q. And when you got [to Clipper], you were told what hours you would be working?

A. Well, I told him what hours that I would be working, and he said that – he wanted to know if I could work – get off at a later time. And he said, "The other guys are going to do it, and you don't have to do it." And I said, "Yes, I will do it."

Q. All right. So you agreed to work the hours that he wanted you to?

A. Well, yes.

Q. And he also asked you if you would work six days a week?

A. He asked me if I wanted to, yes.

Q. And you agreed to work six hours – six days a week.

A. I told him that I would work that.

Q. The six days a week?

A. Yes.

(Docket Entry No. 10, Ex. 1 at 50). Morales's testimony was consistent with that of John Martin, one of the two Acadia supervisors at the shop where Morales worked, who testified

9

that Keith Benton, the plant manager, determined the shift times for employees, including

those hired through Skillmaster.  (Docket Entry No. 10, Ex. 2 at 78).

     The testimony also shows that Acadia determined the specific tasks that Morales

performed.  Morales worked under Acadia-issued work orders that determined what parts

were to be made on the machines that Morales operated, including the size and type of the

parts to be made on each machine.  (Docket Entry No. 10, Ex. 2 at 70–71).  Morales testified

that Acadia determined what machine he would operate:

> Q.    Okay.  And when you met with this man at Clipper, did he explain to
> you what jobs they had?
>
> A.    He told me what I would be doing.
>
> Q.    And what did he tell you would be doing?
>
> A.    Working on one particular press.

(Docket Entry No. 10, Ex. 1 at 43).  Morales's testimony is consistent with the testimony of

John Martin, who said that he assigned Morales to the auto press and trained him in its proper

use.  (Docket Entry No. 10, Ex. 2 at 31–34).  Martin testified as follows:

> Q.    Was Mr. Morales given a specific machine to work on when he showed
> up from SkillMaster?
>
> A.    Yes.
>
> Q.    Do you remember which machine that was?
>
> A.    Auto press.

(*Id.* at 34).

10

Morales argues that Acadia gave him little or no formal training and that he "educated himself" about the machine operations by watching other Skillmaster employees and receiving instructions from them. (Docket Entry No. 10 at 6). Morales argues that he and the other Skillmaster employees received so little supervision and training from Acadia personnel that he believed various Skillmaster employees, his coworkers, were "in charge." (Docket Entry No. 10 at 3). The evidence shows that in November 2003, seven of the nine employees working in the TDI shop were Skillmaster employees. Only the two supervisors, Chuck Courtney and John Martin, were Acadia employees. Morales does not assert, and the record does not show, that Skillmaster had supervisors at the TDI shop or in the Acadia plant. (Docket Entry No. 10, Ex. 2 at 27–29). Morales's deposition testimony shows that although he received little training at Acadia, he did receive instruction on what machine to use and how to use it from Acadia employees. (Docket Entry No. 10, Ex. 1 at 45–47). Morales testified as follows:

Q.     Did anybody tell you what machine to work on?

A.     My first day, the first gentleman from Clipper showed me the machine.

Q.     Okay.  And did he show you how it worked?

A.     Vaguely.

Q.     Vaguely?  did you ask questions?

A.     Yes.

Q.     Since you had never done this type of work before, I take it he needed to tell you what they were making, correct?

11

A.     I don't remember.

Q.     Well, you learned from him that you were going to be making gaskets, right?

A.     I actually didn't know what we were making.

Q.     And were you shown any of the gaskets?

A.     I saw them – you know, where they were after they went through the machine, but I didn't know that it was gaskets.

Q.     They showed you that there was a piece of metal that would be placed in the machine?

A.     Yes.

Q.     And they showed you that you had to open the door to put the piece of metal in there?

A.     I watched.

Q.     And this gentleman was there with you for how long?

A.     Maybe five minutes.

. . . .

Q.     And they would also put graphite into the machine before operating the press?

A.     Yes.

Q.     And you were shown that there were buttons to operate the press?

A.     I watched him push one button.

(*Id.*).   Martin testified that he and Chuck Courtney, the TDI shop supervisors, were responsible for showing Morales how to do his job in the shop. (Docket Entry No. 10, Ex. 2 at 30–31).  Martin testified that he told Morales how to operate the auto press:

Q.     Do you have a specific recollection of you, yourself, training Mr. Morales on the operation of any of the equipment in the TDI process?

A.     Yes, sir.

Q.     When would you have had the occasion to train Mr. Morales concerning the equipment?

A.     The day he was hired?

Q.     Did he come in during the day during your regular hours to do that; or did you stay over and train, offer the training during the second shift?

A.     I would have stayed over.

. . .

Q.     Do you have a recollection specifically of staying over to offer training to Mr. Morales concerning the operation of the equipment in the TDI section?

A.     Yes, sir.

Q.     You identified for me awhile ago the seven pieces of equipment that are a part of the TDI process.  Did you offer Mr. Morales training on each and every one of these seven pieces of equipment on his first day of employment?

A.     No.

Q.     Do you recall which piece of equipment or pieces of equipment specifically that you offered him training on when you stayed over on his first day?

A.     Auto press.

. . .

Q.     Okay.  I want to talk to you about the training that you testified you

provided Mr. Morales on the auto press.  How much time did you spend with Mr. Morales training him on the use of the auto press on his first day at the JM Clipper facility?

A.     Exact amount of time, I can't recall.  It would have been about two hours.

Q.     About two hours, that is?

A.     Yes, sir.

Q.     During that two-hour session, what types of things would you train Mr. Morales on?

A.     The operation of equipment, safety features of the equipment.

(Docket Entry No. 10, Ex. 2 at 31–33.)

On the day Morales was hurt, Chuck Courtney, the Acadia supervisor on duty,

assigned Morales to the No. 2 auto gasket press.  Courtney testified as follows:

Q.     Do you remember the last time prior to his injury that you gave Mr. Morales direction on how to perform the work that he was there to perform at JM Clipper?

A.     Until the day of the accident.

Q.     On the day of the accident, specifically what did you tell him to do in directing his work, on that day, if anything?

A.     . . . . I was on No. – I was on No. 2.  Ernie [Morales] was on No. 3.  He run out of blanks, and the guy come in.  He had told me, "Hey, the glue machine ain't working."

I said, "Okay."

I was walking out of the room; and Ernie said, "Hey, what do you want me to do?"

14

> I said, "Go ahead and get on No. 2.  I'm going to go out here and help this guy fix the glue machine."

Q.    Other than telling him to get on No. 2 when you went to go fix the glue machine, any other direction you gave him on that shift?

A.    When he first started, I told him to get on – you know, get on the auto press, run the auto press.

(Docket Entry No. 10, Ex. 3 at 35–36).

The summary judgment evidence shows that, as a matter of law, Morales was a borrowed employee of Acadia.

## IV.    Analysis

In *Wingfoot,* the Texas Supreme Court noted that "there was summary judgment evidence that [the client company] controlled the details of [the employee's] work at the time of her injury" even though the staffing agency was responsible for hiring, screening, and terminating employees sent to the client company, for paying the employees' salaries, unemployment taxes, social security taxes, and for withholding federal income taxes, for giving the employee details about her job assignment, and for providing basic safety equipment and training.  In *Wingfoot,* the staffing company had supervisors on-site at the client's premises to check employees in, get them started working, issue them proper safety equipment, and monitor their breaks and lunch hours.  111 S.W.3d at 135.  The client company in *Wingfoot* supervised the specific tasks performed by the temporary employees, but the temporary-staffing agency retained the right to determine which employees performed specific tasks at the factory and could substitute different employees to perform

15

particular tasks or reassign an employee to another task. *Id.* In *Wingfoot*, a jury had found that the injured worker was the client company's employee. The Texas Supreme Court noted that the temporary agency and client company were dual employers, despite evidence that the staffing agency had extensive control over certain aspects of the employee's work. *Id.*

The undisputed summary judgment evidence in the present case shows that Skillmaster exerted far less control over Morales than the temporary agency in *Wingfoot* exerted over the injured employee in that case. Morales testified that he only went to Skillmaster twice. The first time was for twenty minutes when he learned of the job at Acadia's plant. He went a second time to pick up his first paycheck and was told that his paychecks would be delivered to Acadia. (Docket Entry No. 10, Ex. 1 at 121–22). There is no evidence that at Acadia, Skillmaster had any control over what Morales did, what machine he worked on, the details of his work, or the hours he worked.

In *Garza*, the Texas Supreme Court held that an injured worker was an employee of the temporary-staffing agency's client because he was working on the client's premises when injured, in furtherance of the client's day-to-day business, and the details of the work that caused his injury were specifically directed by the client. 161 S.W.3d at 477. The *Garza* court reached this conclusion even though the employee testified that he was sometimes supervised—including given instructions as to what to do and how to do it at the job site—by an employee of the temporary staffing agency. *Id.* The undisputed summary judgment evidence in the present case shows that when he was injured, Morales was working at the Acadia plant, on an Acadia machine, at the direction of an Acadia supervisor, to make a part

16

specified by Acadia, in furtherance of Acadia's day-to-day business.  As a matter of law, Morales was a borrowed Acadia employee for the purpose of the Workers' Compensation Act and cannot assert claims against Acadia for negligence, gross negligence, or malice.

**V.      Conclusion**

Acadia's motion for summary judgment is granted.  A final judgment is entered by separate order.

SIGNED on March 27, 2006, at Houston, Texas.

Lee H. Rosenthal
United States District Judge